UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

C.K. LEE, *on behalf of himself and others similarly situated*,

                                        Plaintiff,

                        -v-

MONDELEZ INTERNATIONAL, INC. and
MONDELEZ GLOBAL, LLC,

                                        Defendants.

------------------------------------------------------------------X

22-cv-1127 (LJL)

OPINION AND ORDER

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____           │
│ DATE FILED:  10/28/2022          │
└─────────────────────────────────┘
```

LEWIS J. LIMAN, United States District Judge:

Defendants Mondelez International, Inc. ("Mondelez International") and Mondelez Global, LLC ("Mondelez Global") (collectively, "Mondelez" or "Defendants") move to dismiss the class-action complaint ("Complaint") of Plaintiff C.K. Lee ("Lee" or "Plaintiff") for failure to state a claim for relief pursuant to Federal Rule of Civil Procedure 12(b)(6). In the alternative, to the extent that the Complaint survives Defendants' 12(b)(6) motion to dismiss, Defendants move for an order striking Plaintiff's class allegations either in their entirety or, if the Court does not do so, to strike Plaintiff's class allegations brought pursuant to laws other than the law of New York. Defendants also move to dismiss on the grounds that the Court lacks personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) with respect to the claims of non-New York putative class members and that Plaintiff lacks standing to seek injunctive relief. Dkt No. 19.

## BACKGROUND

The Court accepts the well-pleaded allegations of the Complaint as true.

Mondelez manufactures, packages, distributes, advertises, and markets chocolate products sold under the brand name "Green & Black": "Green & Black's Organic Dark Chocolate" and "Green & Black's Pure Dark Chocolate" (the "Products").  Dkt. No. 1 ¶¶ 1, 12, 13.  Mondelez International specializes in the manufacture of candy and chocolate.  *Id*. ¶ 11.  Mondelez Global, a subsidiary of Mondelez International, distributes the Products.  *Id*. ¶ 12.  The Products include variants that advertise specific percentages of "cacao" on their front label, such as 60%, 70%, and 85% cacao.  *Id*. ¶¶ 1, 9, 14, 17.  The ingredients list on the back labels, however, does not refer to cacao.  Instead, the list refers to chocolate, chocolate liquor, cocoa butter, or cocoa.  *Id.* ¶¶ 15, 18.  The front labels also announce that the Products are "made with the finest Trinitario cacao beans" or "fine Trinitario cacao beans."  *Id.* ¶¶ 14, 17, 25.

All chocolate is derived from the cacao bean.  Cocoa is an inferior and highly processed derivative of the cacao bean that has been stripped of the bean's nutritional qualities.  *Id.* ¶¶ 1, 9.  In essence, the nutritional and health benefits of the cacao bean are greatly reduced or eliminated once it is roasted and processed at high temperatures so as to become cocoa.  *Id.* ¶¶ 1, 24.  The Complaint quotes from several publications touting the health benefits of raw cacao and distinguishing it from processed cocoa.  *Id.* ¶¶ 19–22.  For example, the Complaint, quoting part of an article from a website called *Allrecipes.com*, states that:

> [C]acao powder is made from fermented beans that have not been roasted [and that] are processed at low temperatures and then milled into a powder. The result is a powder that's bitter in taste and higher in nutritional content. Cocoa powder on the other hand is made from beans that are both fermented and roasted, and then processed at a much higher temperature. The result is a less bitter, slightly darker powder that has lost some of its nutritional value.

*Id.* ¶ 19.  The *Allrecipes.com* article goes on to claim that the health benefits of "cacao products," including their "antioxidant, heart-protective, and anti-cancer properties. . . . can be lost during

processing." *Id.* The Complaint also quotes from the website of a so-called "superfood" vendor, Creative Nature, that:

> 'Cocoa' looks the same [as raw cacao powder] however there is a big difference. Cocoa powder is the 'raw cacao' that's been roasted at high temperatures. The effect of roasting the cacao is the molecular structure of the cocoa bean changes, lowering the overall nutritional value and destroying the health benefits. . . . Cacao powder is known to have a higher antioxidant content than cocoa, and cacao is the purest form of chocolate you can consume, which means it is raw and much less processed than cocoa powder or chocolate bars. Cacao is thought to be the highest source of antioxidants of all foods and the highest source of magnesium of all foods.

*Id.* ¶ 21. Similarly, *Navitas Organics*, a purveyor of superfoods, states in a blog on its website:

> Minimally processed cacao powder is an abundant source of minerals (iron, magnesium and potassium), fiber and those unique antioxidants called flavanols, which support cardiovascular and brain health. After cacao has been heated at high temperatures, many of these beneficial nutrients degrade and are no longer significantly present in the powder—quite the unnecessary loss in nutrition.

*Id.* ¶ 20. Finally, a website called *webMD* describes the effect of the chocolate-making process, stating that "[t]he chocolate-making process removes a lot of the antioxidants in raw cacao (almost 60%). However, if you'd still prefer to eat raw cacao in the form of chocolate, you can still get many of the nutrients by eating very dark chocolate (60% to 70% cacao)." *Id.* ¶ 22.

Lee professes to be a "lover of dark chocolate" who has purchased the Products for years, both for their taste and for health benefits. *Id.* ¶ 9. His most recent purchase of one of the Products occurred on November 21, 2021 when he purchased the "Dark 70%" variant of Green & Black's Organic Dark Chocolate. *Id.* Up to this point, Lee had taken the Products' front labels at face value, but after his November purchase, he examined the ingredients statement and saw that it did not list "cacao" as an ingredient, but "cocoa." *Id.* He alleges that Defendants' Products had significantly less value than was warranted by their representations because they did not deliver the qualities promised. Those misrepresentations misled him as to the Products' contents, depriving him of the benefit of his bargain and injuring him in an amount up to the

3

purchase price.  *Id.* ¶¶ 10, 27.  He further alleges that he would not have been willing to pay the

sum he paid had he known the Product was mislabeled.  *Id.*  In contrast to the Products at issue,

Lee also points to a chocolate bar product from a different chocolate manufacturer that represents

on the front label that the product is made from "cocoa," not "cacao."  *Id.* ¶ 23.

Lee alleges that the claims on the front label of the Products that they contain "70%

cacao" and "85% cacao" are misrepresentations in light of the ingredients label that refers to

"cocoa" and "chocolate" but not to "cacao."  *Id.* ¶¶ 15–18.  He also claims that the label's

announcements that the product is "made with the finest Trinitario cacao beans" communicates

that the Products retain nutritional qualities found in cacao beans, when in fact those qualities

were lost.  *Id.* ¶ 25.  He further alleges he purchased the Products believing that they retained the

nutritional qualities associated with raw cacao, that reasonable consumers would understand

from the front labels that the Products retain the nutritional qualities found in cacao beans, and

that neither he nor members of the putative plaintiff class knew or had reason to know that the

Products contained cocoa rather than cacao.  *Id.* ¶¶ 10, 25, 26.  He states that should he encounter

the Products in the future, he could not rely on the truthfulness of the packaging without

corrective changes to it.  *Id.* ¶ 10.

## PROCEDURAL HISTORY

Plaintiff filed his Complaint on February 9, 2022.  Dkt No. 1.  On April 18, 2022,

Defendants filed this motion to dismiss.  Dkt. No. 19.  Plaintiff filed his memorandum of law in

opposition to the motion to dismiss on May 9, 2022.  Dkt. No. 25.  Defendants filed a reply

memorandum of law in further support of the motion to dismiss on May 23, 2022.  Dkt. No. 27.

On June 27, 2022, the Court heard oral argument on the motion to dismiss and on Defendants'

motion for a stay of discovery.  Dkt. Nos. 29, 34.  The Court granted the motion for a stay from

the bench.  Dkt. Nos. 33, 34.

## STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 557 (2006)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This "does not impose a probability requirement at the pleading stage" but rather "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556. That is, a complaint need not allege "detailed factual allegations," but "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

In reviewing a motion to dismiss under Rule 12(b)(6), a court "accept[s] all factual allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id.*, and a complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive dismissal, *Twombly*, 550 U.S. at 555.

**DISCUSSION**

Plaintiff brings three claims against Defendants: (1) violation of New York General Business Law ("GBL") § 349 on behalf the New York class or alternatively on behalf of a Nationwide Class in conjunction with substantively similar consumer protection laws of non-New York states and the District of Columbia, Dkt. No. 1 ¶¶ 42–50; (2) violation of GBL § 350 on behalf of the New York class or alternatively on behalf of a Nationwide Class in conjunction with substantively similar consumer protection laws of non-New York states and the District of Columbia, *id.* ¶¶ 51–58, and (3) common law fraud on behalf of a New York class or alternatively on behalf of a Nationwide Class in conjunction with substantively similar common law of non-New York states and the District of Columbia, *id.* ¶¶ 59–64.

Defendants make two arguments for why the Complaint fails to state a claim for relief. First, they argue that Plaintiff's claims are expressly preempted under the Federal Food, Drug and Cosmetic Act ("FDCA"), as amended by the Nutrition Labeling and Education Act. Dkt. No. 19-1 at 7–9. Second, they argue that the Complaint fails to state a claim because the product labels are accurate and no reasonable consumer would be deceived because the products are made with cacao. *Id*. at 11–12. In addition, Defendants argue that the Court should strike the Plaintiff's class allegations because consumer purchases are driven by many individualized factors, *id*. at 17–19; that the nationwide class allegations should be stricken because the Complaint does not plead an independent cause of action for these laws, *id*. at 19; that Plaintiff lacks standing to seek injunctive relief due to the lack of a future injury*, id*. at 20–22; that there is no personal jurisdiction over Defendants for the claims of non-New York class members, *id*. at 22–24; and that that the Court should not afford leave to amend the Complaint, *id*. at 24. For the following reasons, the Court grants the motion to dismiss Plaintiff's claims without leave to amend. The Court also finds that Plaintiff does not have standing to pursue injunctive relief.

## I.      Preemption

Defendants argue that Plaintiff's claims are expressly preempted by the FDCA, as

amended by the Nutrition Labeling and Education Act of 1990, Pub. L. No. 101–535, 104 Stat.

2353 ("NLEA"), and its regulations governing the standard of identity of "cacao products."  Dkt.

No. 19-1 at 6.  Because the Products comply with the federal ingredient list requirements,

Defendants contend that Plaintiff's claims are preempted.  *Id.* at 8.  Plaintiff argues that his

claims do not concern standards of identity, but instead "label representations about comparative

chocolate quality."  Dkt. No. 25 at 2.  He also contends that there is no U.S. Food and Drug

Administration ("FDA") regulation specifically addressed to whether the Defendants must label

their products as a certain percentage of cacao.  *Id.* at 3–4.  He finally argues that because he is

not seeking to have Defendants add labeling language, but simply to remove language from the

label, his misrepresentation claims are not subject to preemption.  *Id.* at 4.  For the following

reasons, the Court concludes that Plaintiff's claims are not preempted by the FDCA because they

fall outside the scope of FDA regulations.

The labeling of food sold in interstate commerce in the United States is regulated by the

FDA under the FDCA.  Under the FDCA, the FDA has authority to "promulgate regulations

fixing and establishing for any food, under its common or usual name so far as practicable, a

reasonable definition and standard of identity."  21 U.S.C. § 341.  The standard of identity

specifies the defining characteristics of the given food.  In essence, they "determine what a food

product must contain to be marketed under a certain name."  *Bell v. Publix Super Markets, Inc.*,

982 F.3d 468, 483 (7th Cir. 2020).  As described by the FDA, the standards of identity were

"developed to help protect consumers and promote honest and fair dealing" and "ensure that the

characteristics, ingredients and production processes of specific foods are consistent with what

consumers expect."  *See* FDA, "Standards of Identity for Food," Food Labeling & Nutrition

(April 4, 2022), https://www.fda.gov/food/food-labeling-nutrition/standards-identity-food (last accessed October 20, 2022).

The FDCA contains an express preemption clause that prohibits States from imposing requirements for food labeling that are not identical to a standard of identity.  That section of the FDCA, under the heading of "National uniform nutrition labeling," prohibits States from establishing any "requirement" that is "not identical to" the federal requirements in five areas of food labeling, including the "standard of identity."  21 U.S.C. § 343-1(a).  The relevant portion of the preemption clause, subsection (a)(1), provides that:

> (a) Except as provided in subsection (b) of this section, no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce –
>
>> (1)  Any requirement for a food which is the subject of a standard of identity established under section 341 of this title that is not identical to such standard of identity or that is not identical to the requirement of section 343(g) of this title, except that this paragraph does not apply to a standard of identity of a State or political subdivision of a State for maple syrup that is of the type required by sections 341 and 343(g) of this title.

*Id*. § 343-1(a)(1).  Section 343(g) identifies a product as "misbranded" if it "purports to be or is represented as a food for which a definition and standard of identity has been prescribed by regulations" but fails to conform to the standard of identity, which includes complying with the associated definition, standards, and label requirements.  *Id*. § 343(g).  Although the Second Circuit has not expressly addressed this particular preemption clause, it has drawn from sister-Circuit caselaw interpreting this provision in the context of a "similar [FDCA] preemption provision" concerning cosmetics, indicating that the language ought to be construed similarly.[1]

---

[1] The language of the express preemption provision for the labeling or packaging of cosmetics is that "no State or political subdivision of a State may establish or continue in effect any requirement for labeling or packaging of a cosmetic that is *different from or in addition to, or that is otherwise not identical with*, a requirement specifically applicable to a particular cosmetic or class of cosmetics under this chapter, the Poison Prevention Packaging Act of 1970 (15 U.S.C.

*Critcher v. L'Oreal USA, Inc.*, 959 F.3d 31, 37 (2d Cir. 2020) (holding that the FDCA preempted

state law claims regarding a misrepresentation via omission on cosmetics and relying in part on

the Seventh Circuit decision, *Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 427 (7th Cir. 2011), which

held that § 343-1(a)(1) preempted food labeling misrepresentation claims).  In *Crichter*, the

Circuit concluded that the preemption provision preempts "*any* state law that provides for

labeling requirements that are not *exactly* the same as those set forth in the FDCA and its

regulations."  *Id*. at 35–36.

    That sister-Circuit caselaw, not binding on this Court but consistent with *Crichter*, has

generally focused on the presence of misleading omissions that plaintiffs contended required

additional affirmative disclosures to cure.  Those cases generally conclude that such claims seek

---

1471 et seq.), or the Fair Packaging and Labeling Act (15 U.S.C. 1451 et seq.)."  21 U.S.C. §
379s(a) (emphasis added).  While § 343-1(a)(1) does not include the language of "different from
or in addition to," there is no apparent difference in the scope of preemption between the two
clauses.  By its ordinary meaning, "not identical to" includes those regulations that are "in
addition to" or "different from" the federal regulations at issue; the presence of the word
"otherwise" in § 379s(a) indicates that Congress intended to be exhaustive.  Courts within this
Circuit have interpreted the clause similarly.  For example, another court from this District has
concluded that the term "identical" in the statute preempts more than those state laws that
"impose any conflicting requirement on conduct that has been regulated by the FDA," *Bimont v.
Unilever U.S., Inc.*, 2015 WL 5256988, at *3 (S.D.N.Y. Sept. 9, 2015), a conclusion that the
Second Circuit inferred from the presence of the phrase "different from" in the cosmetics
preemption clause, *see Critcher*, 959 F.3d at 35 (concluding that the FDCA preempts "state laws
that are in conflict with it (i.e., any law that is "different from" the FDCA)").  Similarly, courts
have treated the "in addition to" phrasing as substantially similar to the "identical" requirement.
*See Bimont,* 2015 WL 5256988, at *3 (stating that "[a] state rule forbidding non-functional slack-
fill in drugs and cosmetics would impose a requirement *that is in addition to or not identical with*
federal law").  The FDA appears to understand this language similarly to mean that "the only
State requirements that are subject to preemption are those that are affirmatively *different* from
the Federal requirements on matters that are covered by section 403A(a) of the act."  Beverages:
Bottled Water, 60 Fed. Reg. 57076-01, 57120 (Nov. 13, 1995) (Final Rule).  The FDA noted that
such differences can arise from additional state labeling restrictions.  *Id*. at 57119.  Finally, in its
regulations governing the petition request for exemption from the food labeling preemption
clause, the FDA adopts language that in essence mirrors the "different from" or "in addition to"
language.  *See* 21 C.F.R. § 100.1 (defining "not identical to" as those labels that "differ from" or
"are not imposed by or contained in" those in the "applicable provision[s]").

to impose requirements that are "not identical to the labeling requirements imposed on such products by federal law, and so they are barred." *Turek*, 662 F.3d at 427; *see also Nemphos v. Nestle Waters N. Am., Inc.*, 775 F.3d 616, 621 (4th Cir. 2015) (holding that "for a food that is the subject of a federal standard of identity, this provision preempts any pertinent state requirement that is not identical to the federal requirement" in the context of a claim seeking additional disclosures); *but see Bell v. Publix Super Markets, Inc*., 982 F.3d 468, 484 (7th Cir. 2020) (concluding, in the context of a claim of an affirmative misrepresentation that sought relief by removing that misrepresentation, that such a claim was not preempted); *see also Brod v. Sioux Honey Ass'n Co-op*., 609 F. App'x 415, 416 (9th Cir. 2015) (finding that the FDCA preempted conflicting state requirements for the labeling of "honey" when considering a state law claim seeking removal of a misrepresentation).

The existence of an express preemption clause, however, "does not immediately end the inquiry"; it raises but does not resolve the remaining "question of the substance and scope of Congress' displacement of state law." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).  That question is resolved by examination of Congress's language as it has been interpreted by the courts.  Congress, in enacting the NLEA and its express preemption clause, also provided that the NLEA "shall not be construed to preempt any provision of State law, unless such provision is expressly preempted under section 403A of the FDCA."  Pub. L. No. 101–535, § 6(c), 104 Stat. 2353, 2364 (21 U.S.C. § 343-1 note).  Section 403A refers to the preemption clause in 21 U.S.C. § 343-1.  In that respect, Congress "disclaim[ed] federal occupation of the field," *Turek*, 662 F.3d at 425, and intended that state law would remain undisturbed outside of the FDCA and FDA regulations.

The reading of the preemption clause that it does not preempt all state regulation of products regulated by the FDA aligns with—or at least is not contradicted by—the legislative history of the NLEA.  That history reflects Congress's intent that the provision in the NLEA "would prevent State and local governments from adopting inconsistent requirements with respect to the labeling of nutrients or with respect to the claims that may be made about the nutrients in foods."  H. Rep. No. 101–538, 1990 U.S.C.C.A.N. 3336, 3337.  *See also Vermont Pure Holdings, Ltd. v. Nestle Waters N. Am., Inc.*, 2006 WL 839486, at *6 (D. Mass. Mar. 28, 2006) (interpreting such language as "the NLEA was not to preclude all state regulation of nutrition labeling").

In defining the scope of regulated subject matter subject to federal preemption under similar clauses, courts in this District have focused on whether the "subject matter has been regulated by the FDA."[2]  *See Bimont*, 2015 WL 5256988, at *3; *see also see also Goldstein v. Walmart*, No. 22-cv-88, Dkt. No. 42 at 20–26 (providing that imposing state law requirements on the label of "non-drowsy" on over the counter cough medicine constituted regulation of subject matter that was within the scope of federal preemption);  *Canale v. Colgate-Palmolive Co.*, 258 F. Supp. 3d 312, 320 (S.D.N.Y. 2017) (defining the scope of the federal preemption clause as applying to "[w]here federal law specifically regulates the subject matter of a plaintiff's state law claims");  *In re PepsiCo, Inc., Bottled Water Mktg. & Sales Pracs. Litig.*, 588 F. Supp. 2d 527,

---

[2] At least one court in this District has interpreted FDCA preemption provisions more broadly. In *Bimont*, the court has interpreted a preemption provision with similar language as preempting "any non-identical requirement on conduct that could be regulated by the FDA," *Bimont*, 2015 WL 5256988, at *3 (quoting *Bowling v. Johnson & Johnson*, 65 F. Supp. 3d 371, 376 (S.D.N.Y. 2014)).  The Court agrees  that the *Bowling* court had construed the subject matter "at too high a level of generality," *Canale*, 258 F. Supp. 3d at 323, and notes that the FDA's interpretation of the express preemption provision here is persuasive authority that *Canale* and *Pepsico* is the correct approach, at least with respect to § 343–1.

538 (S.D.N.Y. 2008) (defining the scope of preemption as "[w]here federal requirements address the subject matter that is being challenged through state law claims").  This approach comports with how the FDA, through a promulgated Rule, defined the scope of the express preemption clause here.  When discussing the scope of the preemption clause with respect to additional "State requirements," including additional "labeling restrictions," in its Final Rule titled "Beverages: Bottled Water," the FDA stated that "Section 403A(a)(1) of the act only effects preemption *with respect to matters on which a Federal requirement exists*.  If there is no Federal requirement to be given preemptive effect, preemption does not occur."  Beverages: Bottled Water, 60 Fed. Reg. 57076-01, 57119–20 (Nov. 13, 1995) (Final Rule) (emphasis added).  The FDA further explained that:

> FDA acknowledges that some stringent State laws will be preempted by less restrictive Federal regulations. However, one of the goals of the national uniformity provisions of the 1990 amendments was to give industry some relief from some types of State requirements that interfere with their ability to market products in all 50 States in an efficient and cost-effective manner (Statement of Rep. Madigan, 136 Congressional Record H12954 (October 26, 1990)). Thus, in enacting the 1990 amendments, Congress apparently decided that even though Federal requirements may preempt more restrictive State requirements in certain instances, the net benefits from national uniformity in these aspects outweigh the loss in consumer protection that may occur as a result.

*Id*. at 57120.  The FDA's interpretation was in part a response to comments that "requested that FDA more clearly explain the scope of the preemption provision, and that it specifically address whether the agency interprets Federal preemption to apply to certain State requirements (i.e., labeling restrictions, laboratory certification, and certain testing requirements)."  *Id*. at 57119–20.

The Court sees no compelling reason to deviate from the FDA's interpretation of the scope of the express preemption provision, particularly when such an interpretation was promulgated through rulemaking after notice and comment.  Because the FDA's account of the preemption provision is "thorough[], consisten[t], and persuasive[]," it merits at least *Skidmore*

deference.  *Steel Inst. of New York v. City of New York*, 716 F.3d 31, 40 (2d Cir. 2013) (quoting

*Wyeth v. Levine*, 555 U.S. 555, 576–77 (2009)); *see id.* ("We do not defer to an agency's legal

conclusion regarding preemption, but we give 'some weight' to an agency's explanation of how

state or local laws may affect the federal regulatory scheme.").

Plaintiff argues for a more restrictive standard, contending that because "there is no FDA

requirement that Defendants label their Products as 'x% cacao,'" and thus his lawsuit does not

seek to prevent Defendants from including on the label language that the FDA would require be

included in the label, his claims are not preempted.  Dkt. No. 25 at 3–4.  The Court does not

disagree that if the FDA had imposed a requirement governing the labeling of products as "x%

cacao," it would likely preempt Plaintiff's claims.  Thus, for example, had the FDA specified

that products containing either raw cacao or processed cacao could be labeled "cacao," that

regulation would preempt contrary state regulations that sought to prevent Defendants from

using the label "cacao."  However, the scope of review for the matter subject to regulation is not

as narrow as Plaintiff contends.  *See Goldstein*, No. 22-cv-88, Dkt. No. 42 at 23–24 (finding that

claims related to a "non-drowsy" representation were preempted even if the regulation had not

addressed the specific representation).  A state requirement need not directly conflict with a

federal requirement to be preempted.  The FDA specifically emphasized the concerns of

Congress undergirding the preemption clause of "interfere[nce] with [the industry's] ability to

market products in all 50 States in an efficient and cost-effective manner."  Final Rule:

Beverages: Bottled Water, 60 Fed. Reg. at 57120.  A state requirement addressed to a subject

matter that is also subject to an FDA requirement is preempted.  *Bimont*, 2015 WL 5256988, at

*3.

Although the Court disagrees with Plaintiff on the standard to be applied to claims of preemption, it agrees with Plaintiff on the conclusion that his claim is not preempted. Because the Defendants cannot show that the FDA regulated this subject matter, Plaintiff's claims are not preempted.

Defendants argue that the FDA's "standard of identity" regulations governing "cacao products" preempt Plaintiff's claim. Dkt. No. 19-1 at 6–9. Those regulations are outlined in Part 163 of Title 21 of the Code of Federal Regulations. 21 C.F.R. § 163. Subpart A of Part 163 describes methods of determining "shell" and "cacao fat content" in cacao products. *Id.* Subpart B includes specific requirements for the standards of identity for particular "cacao products." Those specific requirements include a "Description," which sets out a definition for the particular product, including what it must contain, such as required proportions of certain ingredients. *See* FDA, "Standards of Identity for Food," *supra*. The standards of identity also often include "[o]ptional ingredients" that may be added to the product without changing its identity, such as spices and additional flavorings. *See*, *e.g.* 21 C.F.R. § 163.130(b)(3) (describing how additional "[s]pices, natural and artificial flavorings" could optionally be added to "milk chocolate"). In addition, the requirements set forth the "Nomenclature" of the product, which also often include additional specifications when certain optional ingredients are added. *See id.* § 163.130(c)(3) (requiring the additional label of, *e.g.*, "[s]pice added" when optional spices are added to "milk chocolate").

As an example, Subpart B includes a standard identity for "sweet chocolate" products— the specific category into which Defendants claim that the Products at issue fall. *See* 21 CFR § 163.123.[3] The description states that "[s]weet chocolate is the solid or semiplastic food prepared

---

[3] Whether all of the Products at issue are appropriately classified as "sweet chocolate" is unclear.

by intimately mixing and grinding chocolate liquor with one or more optional nutritive carbohydrate sweeteners and may contain one of more of the other optional ingredients" specified in the regulation, including cacao fat.  *Id.* § 163.123(a).  "Chocolate liquor," in turn, is the "solid or semiplastic food prepared by finely grinding cacao nibs" and may include optional ingredients such as varieties of "cocoas (breakfast cocoa, cocoa, or lowfat cocoa)."  *Id.* § 163.111(a)(1).  "Cocoa" is prepared by "pulverizing the material remaining after part of the cacao fat has been removed from ground cacao nibs."  *Id.* §§ 163.112(a)(1), 163.113.

Nowhere in the standard of identity for "cacao products" does the FDA address the ingredients necessary for a product to be labeled as "cacao."  The regulations instead show that the FDA often conflates cacao and cocoa.  Although Part 163 may be titled "Cacao Products," 21 C.F.R. § 163, it includes, as previously noted, a broad range of products with both "cocoa" and "cacao" in their specified nomenclature.  For example, under the requirements for specific standardized products, *id.* § 163 Subpart B, Part 163 defines standards of identity for "[c]acao nibs," *id.* § 163.110, but it also describes requirements for "[b]reakfast cocoa," *id.* § 163.112, "[c]ocoa," *id.* § 163.113, "[l]owfat cocoa," *id.* § 163.114, along with a variety of "chocolate" products, *see id.* § 163.123–145—again, all under the header of "cacao products."  The regulation then, on its face, contemplates that varieties of "cocoa" may be classified under the

---

The specified nomenclature of the product is "sweet chocolate," "sweet chocolate coating," "semisweet chocolate," "semisweet chocolate coating," "bittersweet chocolate," or "bittersweet chocolate coating."  21 C.F.R. § 163.12.  The Products appear to be identified as "dark chocolate."  Dkt. No. 1 ¶¶ 14, 17.  There is no standard of identity or outlined nomenclature for "dark chocolate," and while the "Dark 70%" appears to be entirely "bittersweet chocolate," *id.* ¶ 15, which is an appropriate nomenclature for "sweet chocolate," the "Dark 85%" variety in particular appears to be made up of both "chocolate" (which appears to be chocolate liquor) and "cocoa," which is not one of the optional ingredients for "sweet chocolate."  *Id.* ¶ 18.  Because the distinction between "sweet chocolate" and "dark chocolate" is immaterial to this opinion, the Court need not investigate it further.

umbrella of general "cacao products."  Importantly, Defendants have not identified any specific requirement for a product to be named "Cacao" or any percentage composition thereof that distinguishes it from "cocoa," the underlying basis for Plaintiff's misrepresentation claim.

The only product which specifically includes the term "cacao" in its nomenclature requirement is "[c]acao nibs."  *Id*. § 163.110.  That product, of course, is not defined in terms of "cacao" generally, as Defendants have labeled their product here—it specifically is the "food prepared by removing the shell from cured, cleaned, dried, and cracked cacao beans," in which "[t]he cacao shell content is not more than 1.75 percent by weight."  *Id*. § 163.110(a)(1).  It is not the "cacao powder" that Plaintiff's articles in his Complaint seem to refer to.  It is telling that even that specific regulation for "cacao nibs," on its face, does not distinguish between the term "cacao" and "cocoa," because "cacao nibs" has a designated nomenclature of "cacao nibs," "*cocoa* nibs," as well as "cracked *cocoa*."  *Id*. § 163.110(c) (emphasis added).  The regulation otherwise does not distinguish when "cacao nibs" should be used instead of "cocoa nibs," and the two terms appear to be substitutable for one another.  Therefore, the product of "cacao nibs," which is the only specific standard of identity that hews most closely to the term "cacao," does not itself distinguish between "cacao" and "cocoa."  There are no other standardized regulations for other products, whether it be "cacao," "cacao powder," or any other potential variants of cacao.  FDA regulations have conflated both cacao and cocoa nibs for the purposes of the standard of identity—or at least the distinction is immaterial for regulatory purposes.

Nor does the regulatory history of the standard of identity for "cacao products" indicate that the FDA considered the standards necessary for a product to be identified as "cacao" as opposed to "cocoa."  Although the absence of a regulatory finding can under some circumstances have preemptive effect when, for example, the FDA has considered an issue but decided it does

not require a regulation, *see*, *e.g.*, *Goldstein*, No. 22-cv-88, Dkt. No. 42 at 20 (finding that the FDA regulated the subject matter when it recognized certain scientific literature but concluded that available data was insufficient to include the drug as "safe and effective"); *Bimont*, 2015 WL 5256988, at *6 (concluding that after Congress had given invitation to the FDA to regulate a certain area, "[t]he FDA's failure to regulate in this area constitutes strong evidence that the FDA considered the issue of slack-fill in drugs and cosmetics and decided that slack-fill in those products is insufficiently misleading to warrant regulation."), the Court has not found any indication in the extensive history of the "Cacao products" category that the FDA considered the difference between cocoa and cacao and whether there should be any requirements before a product is labeled cacao.[4]  The distinction between "cacao" and "cocoa" thus falls outside the scope of the preemption clause.  Therefore, even if Defendants' Products comply with the "standard of identity" regulations, as Defendants argue in their motion to dismiss, Dkt. No. 10-1 at 8–9, Plaintiff's claim would not be preempted if it does not relate to a subject matter considered by the FDA.  The subject matter of "cacao" versus "cocoa" is one such subject matter.  There is no evidence that subject was considered by the FDA.[5]

The cases upon which Defendants rely are not to the contrary.  Dkt. No. 19-1 at 8–9.  In those cases, the FDA had either already regulated the subject matter at issue, and thus there was

---

[4] The various references to cacao and cocoa throughout the regulatory history concerning amendments to the standard of identity of "cacao products" show that the FDA had long considered the two terms to be interchangeable, and often using the word "cocoa" when the Plaintiff would contend that "cacao" is more accurate.  *See*, *e.g.*, Cacao Products; Proposal To Amend the Standards of Identity, 54 Fed. Reg. 3615-01, 3616 (Proposed Rule) (Jan. 25, 1989) (describing "raw materials" as "cocoa beans, nibs").

[5] The Court, however, rejects Plaintiffs' contention that the mere fact that an alleged misrepresentation is on the "front label" suggests that it is outside the scope of the preemption clause.  Dkt. No. 25 at 2.  Clearly, the standard of identity might also affect front label representations as well—*e.g.*, when it specifies the nomenclature of the item itself.

no real question of whether it fell within the scope of the FDA's regulations.  For example, in *Nemphos*, the Fourth Circuit found that the "standard of identity for bottled water already address[es] fluoride content. . . . [T]he FDA found 'no basis' for a mandatory warning about dental fluorosis and instead left that option to the manufacturers."  775 F.3d at 626.  In *In re Pepsico Inc.*, the district court concluded that the claims were preempted after considering whether "federal requirements address the subject matter that is being challenged through state law."  588 F. Supp. 2d at 537.  Similarly, in *Mills v. Giant of Maryland, LLC*, that district court stated that the "FDA has concluded that the risk of gastrointestinal irritations comparable to those experienced by the lactose intolerant does not implicate 'safety' concerns."  441 F. Supp. 2d 104, 109 (D.D.C. 2006), *aff'd*, 508 F.3d 11 (D.C. Cir. 2007).  The other cases invoke conflict preemption, which clearly indicates that the FDA had regulated the subject matter at issue. *See Brod*, 609 Fed. App'x at 416 (noting preemption when California law prohibited depollinated honey from being labeled as "honey" while federal law required such honey to be labeled as "honey"); *Moore v. Trader Joe's Co.*, 2019 WL 2579219, at *6 (N.D. Cal. June 24, 2019), *aff'd*, 4 F.4th 874 (9th Cir. 2021) (finding preemption when federal regulations permitted branding but state law banned such branding in the context of honey adulteration).

  Defendants' and Plaintiff's additional arguments for and against preemption thus both miss the mark.  Defendants first contend that the FDA standards of identity for chocolate does not list "cacao" as a permitted ingredient and thereby precludes the State of New York, through its consumer protection statute, from requiring Defendants to list "cacao" as an ingredient.  Dkt. No. 19-1 at 1, 9.  Thus, "[b]ecause the chocolate products at issue here are labeled consistently with FDA requirements, the plaintiff's complaint must be dismissed as a matter of law."  *Id.* at 1.  But Defendants' preemption argument misconstrues Plaintiff's claim, which is not based on the

omission of cacao from the ingredients list.  Plaintiff argues that "Defendants should be enjoined from representing the Products as containing cacao on their front labels."  Dkt. No. 1 ¶ 50.  And to the extent that Plaintiff's Complaint could be read to complain about the omission of language from the label, Plaintiff clearly abandons any sort of claim in its opposition brief by stating that it is "not attempting 'to add labeling requirements' but only to 'stop defendants from voluntarily adding deceptive language' to the Products' front labels. Were Defendants to simply cease labeling their products as 'x% cacao,' that would not place them in violation of any FDA requirements."  Dkt. No. 25 at 4; *see id*. ("Plaintiff is not arguing that Defendants should be required to disclose that their chocolate consists of cocoa rather than cacao.").

To the extent that Plaintiff argues that its claim falls outside the scope of the preemption provision because they are not asking for additional disclosures, but simply that the Defendants omit certain language from their labels, that argument too cannot alone establish that his claim is not preempted.  As an initial matter, state laws, including common law, that require parties to remove certain representations still constitute "requirements" within the terms of the statute.  *See Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 443 (2005); *see also Goldstein*, No. 22-cv-88, Dkt. No. 42 at 10, 22–23 (finding that the distinction of omission versus affirmative misrepresentation is a "distinction without a difference").  As discussed above, *supra* at 12, Congress's intent is best understood to ensure uniformity with respect to the subjects that the FDA has addressed.  Uniformity can be destroyed just as much by a requirement that a manufacturer not use certain language as it can be a requirement that it use particular language.  Although Plaintiff here complains about language, affirmative misrepresentations can take other forms.  *See Goldstein*, No. 22-cv-88, Dkt. No. 42 at 22.   The scope of preemption does not turn upon whether the claim is pleaded as one for an affirmative misrepresentation or a misleading

omission.  Even with a claim pleaded as an affirmative misrepresentation, the addition of

language may be necessary "to avoid liability."  *Critcher*, 959 F.3d at 36.  That reading is also

supported here, for this particular clause, by the FDA interpretation, which noted "some stringent

State laws will be preempted by less restrictive Federal regulations" including those governing

labeling restrictions.  *See* Beverages: Bottled Water, 60 Fed. Reg. 57076-01, 57119–20.  It is

thus immaterial to the analysis whether, as pleaded, Plaintiff challenges the absence of language

that would be necessary to avoid a misrepresentation or, as here, the inclusion of language that

constitutes the misrepresentation.

## II.       Whether the Complaint States a Claim for Relief

### A.       N.Y. Gen. Bus. Law Sections 349 and 350

Defendants contend that Plaintiff fails to adequately state a claim of misrepresentation

because the alleged Products are, in fact and as represented, derived from cacao—just "not in the

form that the plaintiff 'imagined.'"  Dkt. No. 19-1 at 12 (quoting Dkt. No. 1).  Plaintiff responds

that "cocoa," as a matter of "ordinary understanding" for a reasonable consumer, is a distinctive

product from "cacao," which remains in an "unprocessed form."  Dkt. No. 25 at 7–8.  In

addition, Plaintiff argues that Defendants' "ambiguous label" cannot be immunized from liability

for misrepresentation.  *Id*. at 8–11.  For the following reasons, the Court agrees that Plaintiff's

GBL claims must be dismissed because Plaintiff has not alleged that the use of the term "cacao"

is misleading for a reasonable consumer.

Section 349 of the NYGBL prohibits "[d]eceptive acts or practices in the conduct of any

business, trade or commerce or in the furnishing of any service in this state."  N.Y. Gen. Bus.

Law § 349(a).  Section 350 of the NYGBL prohibits "[f]alse advertising in the conduct of any

business, trade or commerce or in the furnishing of any service in this state."  *Id*. § 350.  "Under

Sections 349 and 350 [of GBL], plaintiffs must show that they were 'injured as a result of the

deceptive practice, act or advertisement.'" *Fishon v. Peloton Interactive, Inc.*, 2022 WL 3284670, at *11 (S.D.N.Y. Aug. 11, 2022).  New York courts have "defined 'deceptive acts' objectively as acts that are 'likely to mislead a reasonable consumer acting reasonably under 'the circumstances.'" *Id.* (quoting *Oswego Laborers' Local 214 Pension Fund*, 647 N.E.2d 741, 745 (N.Y. 1995)).  In determining whether a label is deceptive, courts "view each allegedly misleading statement in light of its context on the product label or advertisement as a whole," *Wurtzburger v. Ky. Fried Chicken*, 2017 WL 6416296, at *3 (S.D.N.Y. Dec. 13, 2017) (citation omitted), and "context is crucial," *Fink v. Time Warner*, 714 F.3d 739, 742 (2d Cir. 2013); *see*, *e.g.*, *Steele v. Wegmans Food Markets, Inc.*, 472 F. Supp. 3d 47, 50 (S.D.N.Y. 2020) (evaluating the "messages on the container . . . in sequence" in order to "analyze [their] total effect" on the consumer).

At the pleading stage, "a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer," *Fink*, 714 F.3d at 741, but it must proceed with care in doing so as the inquiry "is generally a question of fact not suited for resolution at the motion to dismiss stage," *Duran*, 450 F. Supp. 3d at 346 (collecting cases). "[A]t least in some cases, 'a federal trial judge, with a background and experience unlike that of most consumers, is hardly in a position to declare' that reasonable consumers would not be misled." *Stoltz v. Fage Dairy Processing Indus., S.A.*, 2015 WL 5579872, at *20 (E.D.N.Y. Sept. 22, 2015) (quoting *Verizon Directories Corp v. Yellow Book USA, Inc.*, 309 F. Supp. 2d 401, 407 (E.D.N.Y. 2004) (noting that resolution of the issue may require "surveys, expert testimony, and other evidence of what is happening in the real world")).  However, while plaintiffs are "not required to meet the heightened pleading requirements of [Rule] 9(b) for [GBL] claims," *Cosgrove v. Oregon Chai*, 520 F. Supp. 3d 562, 575–76 (S.D.N.Y. 2021),

"plaintiffs must do more than plausibly allege that a label might conceivably be misunderstood by some few consumers.  Instead, Plaintiffs must plausibly allege that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Campbell v. Whole Foods Mkt. Grp., Inc*., 516 F. Supp. 3d 370, 381 (S.D.N.Y. 2021) (quoting *Lugones. v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 242 (S.D.N.Y. 2020)); *see also Budhani v. Monster Energy Co.*, 527 F. Supp. 3d 667, 676 (S.D.N.Y. 2021).

Defendants contend that "at most, the complaint alleges that *the plaintiff believed* that the phrase 'made with cacao' . . .  meant the cacaos in the products was raw/unprocessed."  Dkt. No. 19-1 at 12 (emphasis in original).  Plaintiff replies by arguing that Defendants misrepresented that the Products were manufactured with raw, unprocessed cacao, with all of the health benefits such cacao would provide.  Dkt. No. 1 ¶ 14–24.  He claims that a reasonable consumer would understand the reference to "70% cacao" or "85% cacao," when read in the context of the label as a whole, to refer to raw cacao.  In his memorandum of law in opposition to the motion to dismiss, Plaintiff states that "in ordinary parlance, 'cocoa' is used to designate the processed form of cacao whereas 'cacao' is used to designate the unprocessed form."  Dkt. No. 25 at 7–8.

The Court agrees with the Defendants that Plaintiff does not allege anything with respect to what a reasonable consumer might believe as to the word "cacao" and its level of processing. The Complaint contains no allegations that support that a reasonable consumer would believe that "cacao" is associated with "unprocessed cacao."  It is undisputed that the label itself makes no representation about whether the cacao has been processed, only stating a percentage followed by the word "cacao."  *See*, *e.g.*, *Harris v. Mondelez Glob. LLC*, 2020 WL 4336390, at *3 (E.D.N.Y. July 28, 2020) (noting, in rebutting a misrepresentation claim for "made with real

cocoa," that "'[t]here is no "only" or "exclusively" modifier before' the phrase 'real cocoa.'" (citation omitted)).  Read in context, the language on its face does not imply that the cacao is unprocessed.  In fact, the label suggests the opposite.  The label appears as follows (with the purple circle around the language "85% cacao" added by Plaintiff and not on the original):



Dkt. No. 1 ¶¶ 14, 15.




Dkt. No. 1 ¶¶ 17, 18.

The labels first state that the bars are "DARK CHOCOLATE *made with* the finest Trinitario cacao beans," or in the case of the 85% variety, "our darkest chocolate *made with* fine Trinitario cacao beans."  Dkt. No. ¶¶ 14, 17 (emphasis added).  Those front labels indicate the natural source of the essential flavor ingredient in the product and more importantly indicate that such beans were processed.  There is no other reasonable way to understand the reference to "made with" (as opposed to "containing").  Further, in context, the label clearly conveys a message regarding how much of the Products is derived from a particular type of "cacao bean," and not either the nature of the processing of the bean or its nutritional value.  The reference to the percentage of cacao is directly below this representation of "finest" or "fine" "Trinitario cacao beans" on the front label.  Dkt. No. ¶¶ 14, 17.  The placement of the percentage reference directly below the representation of "Trinitario cacao beans" thus could only indicate to a

24

reasonable consumer that the "x" percentage of the Product is derived from the Trinitario cacao bean (as opposed to, for example, other ingredients, such as sugar or vanilla extract, *id*.), not that the cacao remained in its raw unprocessed form.  The ingredients label also contains the word "cocoa," "chocolate liquor," and "cocoa butter," which dispel any misimpression that the "cacao" remains in an unprocessed, "raw" form.[6]  It is thus implausible that a reasonable consumer seeing the term "cacao" would necessarily infer that the product contains only the unprocessed form of cacao.  *See Davis v. Hain Celestial Grp., Inc*, 297 F. Supp. 3d 327, 334 (E.D.N.Y. 2018) ("If a plaintiff alleges that an element of a product's label is misleading, but another portion of the label would dispel the confusion, the court should ask whether the misleading element is ambiguous. If so, the clarification can defeat the claim.").

Further, even assuming that a consumer would understand the reference to "cacao" to be to the raw ingredient, Plaintiff would have failed to plead falsity.  Plaintiff's claim is premised on the alleged discrepancy between the front label which refers to cacao and the ingredient list which refers to "cocoa."   Plaintiff contends that the Product cannot contain cacao because the list refers to cocoa.  But there is no such discrepancy.  The two are equivalent as both are derived from the cacao plant.  The ingredient list does not contain the word "cacao" because the FDA regulations require the manufacturer to list "cocoa powder" and "chocolate liquor," both forms of processed cacao, and does not have a separate requirement for "cacao."  It does not mean that

---

[6] While Plaintiff cites *Mantikas v. Kellogg Co.*, 910 F.3d 633 (2d Cir. 2020), to rebut the assertion that the ingredient list may cure the alleged misrepresentation, *Mantikas* is inapposite. Here, the "ingredient list does not correct any misleading information; rather, it confirms that" the percentage of cacao representation is a reference generally to its ingredients as originating from "cacao products" from the cacao bean.  *Sarr v. BEF Foods, Inc*., 2020 WL 729883, at *5 (E.D.N.Y. Feb. 13, 2020); *see also Winston v. Hershey Co.*, 2020 WL 8025385, at *4 (E.D.N.Y. Oct. 26, 2020) ("[T]he ingredient list confirms what the absence of the word 'chocolate' on the packaging suggests—that Reese's White is not white chocolate.").  Any ambiguity was cured by the presence of the ingredient list and other representations on the Products.

the product is not made from "cacao."  The chocolate here is made from "cacao products," as the FDA regulations indicate.  Both chocolate liquor and cocoa powder are derived from the cacao plant, and since the ingredient list states that the Products contain both chocolate liquor and cocoa powder, it follows that the Products themselves are made from cacao.  Although Plaintiff alleges a misrepresentation on the basis of "examin[ing] the ingredients statement [and] observ[ing] that it listed not cacao but rather cocoa," Dkt. No. 1 ¶ 9 (underlining in original), it is equally plausible from the ingredient list itself that the Products contain some form of less processed cacao as they may contain some more processed form.  The only inference that can be drawn from the fact that Defendants do not list cacao itself is that Defendants are following FDA regulations.  No plausible inference can be drawn that the product does not contain "cacao."  *See Puri v. Costco Wholesale Corp.*, 2021 WL 6000078, at *6 (N.D. Cal. Dec. 20, 2021) ("Even accepting Puri's allegations that the Product's packaging incorrectly uses the term 'unsweetened chocolate processed with alkali' instead of 'unsweetened cocoa powder processed with alkali,' 'cocoa powder' nonetheless still comes from cacao beans.").

Plaintiff argues that a reasonable consumer would understand the reference to a percentage of cacao on the Products to refer to the raw form of cacao based on excerpts from the articles from *Allrecipes.com*,[7] *Nativas Organics*,[8] *Creative Nature*,[9] and *webMD*.[10]  Complaint

---

[7] Melanie Fincher, Allrecipes.com, "What's the Difference Between Cocoa and Cacao Powder?", https://www.allrecipes.com/article/difference-between-cocoa-and-cacao/ (Nov. 1, 2019) ("*Allrecipes.com*").

[8] Julie Morris, Nativas Organics, "What's the Difference Between Cacao and Cocoa?", https://navitasorganics.com/blogs/navitaslife/whats-the-difference-between-cocoa-and-cacao (Jan. 15, 2020) ("*Nativas Organics*").

[9] Fred Higson, "Cacao v. Cocoa – What's the difference?", https://www.creativenaturesuperfoods.co.uk/blog/cacao-vs-cocoa-whats-the-difference/ (Jan. 25, 2017) ("*Creative Nature*").

[10] webMD, "Health Benefits of Cacao," https://www.webmd.com/diet/health-benefits-cacao#2 ("*webMD*").

¶¶ 19–22.  Those articles do not "nudge[ ] their claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.[11]  As an initial matter, with one potential exception, the articles are not about chocolate bars at all, the product at issue in this case.  Three of the four articles are about cacao powder and cocoa powder.  *Allrecipes.com*; *Nativas Organics*; *Creative Nature*.  Thus, for example, the article from *Allrecipes.com* is entitled "What's the Difference Between Cocoa and Cacao Powder" and states that "cacao powder is made from fermented beans that have no been roasted [and] processed at low temperatures and then milled into powder" while "cocoa powder . . . is made from beans that are fermented and roasted and then processed at a much higher temperature."  *Allrecipes.com*.  It goes on to discuss the use of cacao powder in yogurt bark, hot cocoa, and banana cacao muffins.  *Id.*  The *Creative Nature* blog is an advertisement for the manufacturer's "Organic Cacao Powder" and contains a link to a website where that powder may be purchased.  *Creative Nature*.  It too discusses the difference between cocoa powder and cacao powder, stating that "[c]acao powder is known to have a higher antioxidant content that cocoa" and exhorting readers: "You can use cocoa powder and cacao powder interchangeably in baking recipes, smoothies, and other treats so making the change to cacao is easy . . . ."  *Id.*  The *Navitas Organics* blog also is an advertisement for the cacao powder sold by Navitas.  After discussing the difference between cacao powder and cocoa powder, it encourages consumers: "we at Navitas recommend choosing our Cacao Powder over

---

[11] Plaintiff briefly and summarily asserts in his opposition that "many dark chocolate products do, in fact, contain unprocessed cacao," while citing these articles at Paragraphs 19–22.  Dkt. No. 25 at 10.  The Court does not find any such reading in those articles.  First, as previously mentioned, to the extent that the articles talk about any products, they are generally talking about cacao *powder*, not cacao in chocolate form, like the Products here.  Second, two of the articles— from Nativas Organics and Creative Nature Superfoods—are advertisements for their own products.  Such advertisements says little about what general consumers expect as to the specific representation of "cacao" on a label.  The *webMD* article mentions no specific products or consumer perceptions of those products.

unsweetened cocoa powder (or another natural cacao product like our Cacao Nibs or our Cacao Sweet Nibs over chocolate chips) whenever possible." *Nativas Organics*.  The terms cacao powder, cacao nibs, and cacao sweet nibs contain hyperlinks, and the advertiser offers readers: "Check out some of our favorite cacao recipes for immediate inspiration."  The Complaint offers no reason to believe that the consumer of Plaintiff's Products, who happened upon these advertisements, would confuse "cacao powder" for "cacao" on the Product's label or believe that the same product that is used as a baking ingredient is also identical to the ingredient in the Products.

The *webMD* article is not an explicit advertisement for cacao powder, but it does not help Plaintiff.  The article makes clear that all chocolate comes from the beans of the cacao tree and then distinguishes between cacao—which when fermented and roasted is used to make chocolate—and raw cacao, which has a high amount of antioxidants, minerals, and vitamins and which is made by "[c]old-pressing unroasted cacao."  *webMD*.  It states that "[t]he chocolate-making process removes a lot of the antioxidants in raw cacao" but that consumers who "prefer to eat raw cacao in the form of chocolate . . . can still get many of the nutrients by eating very dark chocolate (60% to 70% cacao)."  *Id*.  It does not state that the cacao that is in such chocolate is "raw cacao."  *Id*.  To the contrary, it too refers to "raw cacao powder."  *Id*.  The inference is that when a manufacturer intends to refer to the cacao that has the health benefits Plaintiff claims he believed the Products to have, it refers to "raw cacao," or to "raw cacao powder" or to "cacao nibs."  The reference to "cacao" itself signifies nothing about how and at what temperature the cacao bean is processed.

Moreover, Plaintiff makes no allegations with respect to the distribution or readership of these articles and blogs in order to connect them to the understanding of the reasonable

consumer.  *See*, *e.g.*, *Wynn v. Topco Assocs.*, 2021 WL 168541, at *3 (S.D.N.Y. Jan. 19, 2021)

(finding failure to state a claim when Plaintiff failed to link consumer perceptions to regulatory

requirements).  As noted, two of them are product advertisements and a third is contained on a

recipes website for those who cook.  Only the fourth appears to be directed to the general public

(or a public that might consume the Products) and that article encourages the use of cacao

powder and not the consumption of chocolate bars.  *See*, *e.g.*, *Gordon v. Target Corp.*, 2022 WL

836773, at *10 (S.D.N.Y. Mar. 18, 2022) (stating that articles that are not "specific to Defendant

or the Product" did not satisfy plaintiff's burden).  Plaintiff references no surveys, let alone any

allegation of fact—anecdotal or scientific—to provide empirical support that the reasonable

consumer would understand a reference to cacao on a chocolate bar to be a reference to its

unprocessed or minimally processed form.  It thus is a far leap to assume that because Plaintiff

has able to locate articles that discuss the differences between raw cacao powder and cocoa

powder that a consumer who purchases a chocolate bar advertised to contain "x% cacao" would

understand that reference to be to the raw form of the cacao bean rather than to its more

processed version.  *See Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 242

(S.D.N.Y. 2021) (rejecting GBL claims because "[p]laintiffs provide no empirical basis to

substantiate their assertion that reasonable consumers would interpret the Product's label to

imply an exclusive source of vanilla flavoring").

Finally, that the term "cacao" does not plausibly imply anything about the level of

processing to the reasonable consumer is further bolstered by FDA regulations governing "cacao

products."  It is undisputed that the Products here are classified as "cacao products" under Part

163, even when they contain "cocoa" ingredients, demonstrating that the distinction between

"cacao" and "cocoa" on the basis of processing is tenuous, at best.  As previously noted, Part 163

conflates "cacao" and "cocoa" in its nomenclature requirements for "cacao nibs," the sole specific standardization for any "cacao product" with "cacao" in its nomenclature requirement. *See supra* Section I.  That regulation has been in place for over half a century.  And while these facts suggest that Plaintiff's claims are not expressly preempted, they also serve as "persuasive evidence of the meaning of the label" in the cacao context—namely, that the two terms have been treated as interchangeable, and that use of the word "cacao" in lieu of "cocoa" is not misleading or necessarily based on the level of processing.  *Geffner v. Coca-Cola Co.*, 928 F.3d 198, 200 (2d Cir. 2019) (finding that "longstanding" FDA authorization of the term "diet" for "low or reduced calories" was "persuasive evidence of the meaning of the label 'diet' in the diet-soda context" and rebutted claims that "diet" misleading promised weight loss).[12]

## III.    Common Law Fraud

Defendants contend that Plaintiff does not meet the requirements of Federal Rule of Civil Procedure 9(b) for pleading fraud.  They also argue that the common law fraud claims fail for the same reason that Plaintiff's GBL claims fail.  Plaintiff contends that he has adequately alleged fraud under Rule 9(b) and that he has alleged a misrepresentation of fact or omission.  For the following reasons, the Court concludes that Plaintiff has not adequately alleged fraud and has not alleged a misrepresentation of fact or omission.

Under New York law, stating a claim for fraud requires alleging (1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff.  *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997).

---

[12] Further, the FDA allows nomenclature of "cacao nibs" or "cocoa nibs" to still be used even when it is "processed by heating," 21 C.F.R. § 163.110(a)(2), or "further processed with one or more of . . . neutralizing agents," *id*.

For the reasons previously stated, Plaintiff has failed to allege a misrepresentation of fact or omission because he has failed to allege that a reasonable consumer would have associated the word "cacao" with "unprocessed cacao." *See Wynn v. Topco Assocs.*, LLC, 2021 WL 168541, at *7 (concluding that the material misrepresentation requirement was not met when "a reasonable consumer would not conclude that the word 'vanilla' on the product's label communicates that the flavor derives exclusively from real vanilla"). On the facts alleged here, the presence of the ingredient list to disclose the meaning of "cacao" only further undermines any claim of misrepresentation. *See Yu v. Dreyer's Grand Ice Cream, Inc.*, 2022 WL 799563, at *10 (S.D.N.Y. Mar. 16, 2022) (finding that "ingredient list accurately discloses the presence of coconut and vegetable oil in the Product's coating").

Plaintiff also has not adequately alleged scienter under Rule 9(b) for a common law fraud claim. Although a plaintiff may plead scienter for the purposes of a common law fraud claim generally, the plaintiff "must still allege facts that give rise to a strong inference of fraudulent intent." *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 472 (S.D.N.Y. 2020). "This inference may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (citation omitted). The Complaint asserts only purely conclusory allegations with respect to intent. The Complaint claims that "Defendants intentionally makes materially false and misleading representations regarding the nature of the Products," Dkt. No. 1 ¶ 60, and "Defendants knew and intended that Plaintiff and the Class members would rely on their misrepresentations that their dark chocolate consisted of cacao," *id*. ¶ 62. Those are conclusions, not facts.

Plaintiff argues that a strong inference can be drawn from the facts alleged in the Complaint that because he has alleged that Defendants manufacture and market chocolate products, they can "be presumed to understand the difference between cocoa and cacao," Dkt. No. 25 at 15, and because "other chocolatiers know how to honestly describe their coca-based chocolate products as containing cocoa, . . . we can reasonably surmise that Defendants consciously considered which term to use." *Id*. As previously discussed, however, the Complaint does not allege any generally understood difference between cacao and cocoa. There is a difference between raw cacao and processed cacao, and between cacao nibs and cocoa powder, but not between cacao (from which cocoa is derived) and cocoa. To the extent that Plaintiff alleges that Defendants conflate cacao (the source material) from cocoa (the derivative), the FDA itself makes the same "mistake." The fact that other chocolatiers might choose to advertise their products differently does not lead to a contrary conclusion. In the absence at least an allegation of fact that those other chocolatiers have concluded that a claim such as Defendants' is misleading and further that Defendants are aware that those chocolatiers have reached that conclusion, the mere fact that two chocolatiers have adopted different approaches does not suggest that either approach is misleading much less knowingly or recklessly so. Our commercial language would be impoverished indeed if all manufacturers were required to use identical language lest any difference itself be sufficient to support a claim of fraud.

## IV. Standing for Injunctive Relief

Defendants also contend that Plaintiff does not have standing to seek injunctive relief. Dkt. No. 19-1 at 20–21. Plaintiff contends that he has standing to assert such relief. Dkt. No. 25 at 18–21. For the following reasons, Plaintiff does not have standing to assert injunctive relief.

"Under Article III of the U.S. Constitution, '[t]he judicial Power of the United States' extends only to certain 'Cases' and 'Controversies.'" *Lacewell v. Off. of Comptroller of*

*Currency*, 999 F.3d 130, 141 (2d Cir. 2021) (alteration in original) (quoting U.S. Const. art. III, §§ 1–2).  In order to invoke federal judicial power, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  To maintain an action for injunctive relief, a plaintiff "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983)).  Such injury must be "actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009).

In *Berni v. Barilla S.p.A*, the Second Circuit applied principles of Article III standing in the context of a motion for class certification concerning claims for deceptive packaging under GBL § 349.  964 F.3d 141, 144 (2d Cir. 2020).  The Circuit then concluded that "past purchasers of a product . . . are not likely to encounter future harm." *Id*. at 147.  The Circuit did so because such purchasers are "not bound to purchase a product again—meaning that once they become aware they have been deceived, that will often the last time they will buy that item." *Id*.  Such purchasers also "do not have the sort of perpetual relationship with the producer of a consumer good." *Id*.  And even if they purchase it again, "there is no reason to believe that [they] . . . will incur harm anew.  Supposing that they have been deceived by the product's packaging once, they will not again be under the illusion . . . ." *Id*. at 148.

Plaintiff's future injury is purely hypothetical and thus does not suffice to provide standing for injunctive relief.  Plaintiff states that he is a "lover of dark chocolate who has been purchasing the Products for years," but that "should Plaintiff Lee encounter the Products in the future, he could not rely on the truthfulness of the packaging without corrective changes to it."

Dkt. No. 1 at 9–10.  Such language is purely hypothetical—*if* Plaintiff encounters the Products in the future, he will not be able to rely on the label.  *See Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 465 (S.D.N.Y. 2020) (Nathan, J.) (stating that a plaintiff did not have standing because the injury of that past purchaser was "*hypothetical—if* they choose to purchase Godiva's products in the future, *then* they *may* be harmed.").  Now that Plaintiff has looked at the label, he will not be under the illusion that the product contains unprocessed cacao, but instead some combination of chocolate and cocoa, and thus is unlikely to buy it again.  Plaintiff does not otherwise allege that he will buy the products again or is obligated to do so.  *See Goldstein v. Walmart*, No. 22-cv-88, Dkt. No. 42 at 27–30;  *Gordon v. Target Corp*., 2022 WL 836773, at *8 (S.D.N.Y. Mar. 18, 2022) (stating that there is no future injury because "Plaintiff allegedly is now aware that the Product is not recommended by pediatric health experts, does not offer superior nutritional value to the less-expensive whole cow's milk, and is not non-GMO"); *Haft v. Haier US Appliance Sols., Inc.*, 578 F. Supp. 3d 436, 467 (S.D.N.Y. 2022) (same with claim regarding defective ovens); *Quintanilla v. WW Int'l, Inc.*, 541 F. Supp. 3d 331, 341 (S.D.N.Y. 2021) (same).  Plaintiff's only cites out-of-Circuit district court cases that are not binding on this Court or cases in this Circuit decided before *Berni*.

## V.    Leave to Amend

Defendants also argue that Plaintiff should not be granted leave to amend.  Dkt. No. 19-1 at 24.  Plaintiff does not contest this argument.  For the following reasons, the Court declines to grant leave to amend.

Although "a party may amend its pleading only with the opposing party's written consent or the court's leave" after the expiration of time for amendment as a matter of course, "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "One appropriate basis for denying leave to amend is that the proposed amendment is futile," and a

proposed amendment "is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).  Leave to amend is futile here based on the Court's findings that the "% cacao" label, when read in the context of the front label's statement that the product is "made with the finest Trinitario cacao beans," Dkt. No. 1 ¶¶ 14, 17, the context of the ingredient labeling statement, *id*. ¶¶ 15, 18, and the undisputed regulatory categorization of the Products as "cacao products," all indicate that no reasonable consumer would be misled by the statement of "cacao" on the front label to believe that the product contained "raw cacao" or cacao possessing the medicinal qualities of raw cacao.  *See Melendez v. ONE Brands, LLC*, 2020 WL 1283793, at *9 (E.D.N.Y. Mar. 16, 2020) (declining leave to amend when "no reasonable consumer could have been misled about the bars' carbohydrate or caloric contents in light of the clarifying language found on the back panel of the bars' packaging.").

Further, any argument regarding leave to amend has been expressly waived by Plaintiff by failing to raise it in his opposition brief.  *See*, *e.g.*, *Flynn v. James*, 513 F. App'x 37, 40 (2d Cir. 2013) ("Flynn similarly argues for the first time on appeal that the district court erred in dismissing his complaint without granting him leave to amend.  Flynn did not seek leave to amend below.  Thus, we decline to consider Flynn's argument in this regard."); *Neurological Surgery, P.C. v. Travelers Co.*, 243 F. Supp.3d 318, 329 (E.D.N.Y. 2017) (deeming an argument waived because it was not addressed in a party's opposition brief).

**CONCLUSION**

For these reasons, the Court dismisses Plaintiff's claims with prejudice.[13]  The Clerk of Court is respectfully directed to close Dkt. No. 19.

SO ORDERED.

Dated: October 28, 2022
       New York, New York                          _____
                                                          LEWIS J. LIMAN
                                                   United States District Judge

---

[13] Because the Court dismisses Plaintiff's claims for failure to state a claim, it need not address whether the Court possess personal jurisdiction over the claims of non-New York class members. Although the Court would normally address personal jurisdiction prior to deciding the merits, "in cases such as this one with multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, we may address first the facial challenge to the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the personal jurisdictional claims made by some defendants. This is particularly true when the personal jurisdictional challenges are based on factual allegations that are, in this early posture, still under development." *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012).  It is undisputed that the Court has personal jurisdiction with respect to Plaintiff's claims for damages, and thus it is appropriate to address the merits here.